## *PRELIMINARY PRINT*

# VOLUME 599 U. S. PART 1

### PAGES 555–599

---

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 22, 2023

Page Proof Pending Publication

## REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## ARIZONA ET AL. *v.* NAVAJO NATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–1484.   Argued March 20, 2023—Decided June 22, 2023*

An 1868 peace treaty between the United States and the Navajo Tribe established the Navajo Reservation that today spans some 17 million acres, almost entirely in the Colorado River Basin of the western United States.   The Federal Government's reservation of land for an Indian tribe implicitly reserves the right to use needed water from various sources—such as groundwater, rivers, streams, lakes, and springs—that arise on, border, cross, underlie, or are encompassed within the reservation.   See *Winters* v. *United States*, 207 U. S. 564, 576–577.   While the Tribe has the right to use needed water from the reservation's numerous water sources, the Navajos face the same water scarcity problem that many in the western United States face.   In the Navajos' view, the Federal Government's efforts to assist the Navajos with their water needs did not fully satisfy the trust obligations of the United States under the 1868 treaty.   The Navajos filed suit seeking to compel the United States to *take affirmative steps* to secure needed water for the Tribe—including by assessing the Tribe's water needs, developing a plan to secure the needed water, and potentially building pipelines, pumps, wells, or other water infrastructure.   The States of Arizona, Nevada, and Colorado intervened against the Tribe to protect those States' interests in water from the Colorado River.   The U. S. District Court for the District of Arizona dismissed the Navajo Tribe's complaint, but the Ninth Circuit reversed, holding in relevant part that the United States has a duty under the 1868 treaty to take affirmative steps to secure water for the Navajos.

*Held*: The 1868 treaty establishing the Navajo Reservation reserved necessary water to accomplish the purpose of the Navajo Reservation but did not require the United States to take affirmative steps to secure water for the Tribe.   Pp. 563–570.

  (a) The Tribe asserts a breach-of-trust claim based on its view that the 1868 treaty imposed a duty on the United States to take affirmative steps to secure water for the Navajos.   To maintain such a claim here, the Tribe must establish, among other things, that the text of a treaty,

---

*Together with No. 22–51, *Department of the Interior et al.* v. *Navajo Nation et al.*, also on certiorari to the same court.

statute, or regulation imposed certain duties on the United States. See *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 173–174, 177–178. The Federal Government owes judicially enforceable duties to a tribe "only to the extent it expressly accepts those responsibilities." *Id.*, at 177. Whether the Government has expressly accepted such obligations "must train on specific rights-creating or duty-imposing" language in a treaty, statute, or regulation. *United States* v. *Navajo Nation*, 537 U. S. 488, 506.

Here, while the 1868 treaty "set apart" a reservation for the "use and occupation of the Navajo tribe," 15 Stat. 668, it contains no language imposing a duty on the United States to take affirmative steps to secure water for the Tribe. See *Navajo Nation*, 537 U. S., at 506. Notably, the 1868 treaty did impose a number of specific duties on the United States, but the treaty said nothing about any affirmative duty for the United States to secure water. As this Court has stated, "Indian treaties cannot be rewritten or expanded beyond their clear terms." *Choctaw Nation* v. *United States*, 318 U. S. 423, 432.

To be sure, this Court's precedents have stated that the United States maintains a general trust relationship with Indian tribes, including the Navajos. *Jicarilla*, 564 U. S., at 176. But unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not "apply common-law trust principles" to infer duties not found in the text of a treaty, statute, or regulation. *Id.*, at 178. Here, nothing in the 1868 treaty establishes a conventional trust relationship with respect to water. And it is unsurprising that a treaty enacted in 1868 did not provide for all of the Navajos' current water needs 155 years later. Under the Constitution, Congress and the President have the responsibility to update federal law as they see fit in light of the competing contemporary needs for water.

(b) Other arguments offered by the Navajo Tribe to support its claims under the 1868 treaty are unpersuasive. *First*, that the 1868 treaty established the Navajo Reservation as a "permanent home" does not mean that the United States agreed to take affirmative steps to secure water for the Tribe. *Second*, the treaty's express requirement that the United States supply seeds and agricultural implements for a 3-year period to the Tribe does not, as the Tribe contends, mean that the United States has an additional duty to take affirmative steps to secure water, but rather demonstrates that the United States and the Navajos knew how to impose specific affirmative duties on the United States under the treaty. *Third*, the Tribe asserts that the United States's purported control over the reserved water rights supports the view that the United States owes trust duties to the Navajos. But the "Federal Government's liability" on a breach-of-trust claim "cannot be

Syllabus

premised on control alone." *United States* v. *Navajo Nation*, 556 U. S. 287, 301. *Finally*, the text of the treaty and records of treaty negotiations do not support the claim that in 1868 the Navajos would have understood the treaty to mean that the United States must take affirmative steps to secure water for the Tribe.

26 F. 4th 794, reversed.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 570. GORSUCH, J., filed a dissenting opinion, in which SOTOMAYOR, KAGAN, and JACKSON, JJ., joined, *post*, p. 574.

*Frederick Liu* argued the cause for the federal petitioners in both cases. With him on the briefs were *Solicitor General Prelogar*, *Assistant Attorney General Kim*, *Deputy Solicitor General Kneedler*, *William B. Lazarus*, and *John L. Smeltzer*. *Rita P. Maguire* argued the cause for the state petitioners in both cases. With her on the briefs were *Nicole D. Klobas*, *Jennifer Heim*, *Stuart L. Somach*, *Robert B. Hoffman*, *John B. Weldon, Jr.*, *Lisa M. McKnight*, *Aaron Ford*, Attorney General of Nevada, *Lauren J. Caster*, *Bradley J. Pew*, *Gregory J. Walch*, *Marcia L. Scully*, *Catherine M. Stites*, *Steven B. Abbott*, and *Charles T. DuMars*. *Philip J. Weiser*, Attorney General of Colorado, *Eric R. Olson*, Solicitor General, *Scott Steinbrecher*, Assistant Deputy Attorney General, *A. Lain Leoniak*, First Assistant Attorney General, and *Russell D. Johnson*, Assistant Solicitor General filed briefs for the State of Colorado in No. 21–1484.

*Shay Dvoretzky* argued the cause for respondents in both cases. With him on the brief were *Parker Rider-Longmaid*, *Sylvia O. Tsakos*, *Jeremy Patashnik*, *M. Kathryn Hoover*, *G. Michelle Brown-Yazzie*, *Paul Spruhan*, and *Alice Elizabeth Walker*.†

---

†Briefs of *amici curiae* urging reversal in both cases were filed for the Citizens Equal Rights Foundation by *Lawrence A. Kogan*; and for Western Water Users and Trade Associations by *Jeremy C. Marwell* and *Matthew X. Etchemendy*.

Briefs of *amici curiae* urging affirmance in both cases were filed for the Coalition of Large Tribes by *Troy A. Eid* and *Jennifer H. Weddle*; for the

JUSTICE KAVANAUGH delivered the opinion of the Court.

In 1848, the United States won the Mexican-American War and acquired vast new territory from Mexico in what would become the American West. The Navajos lived within a discrete portion of that expansive and newly American territory. For the next two decades, however, the United States and the Navajos periodically waged war against one another. In 1868, the United States and the Navajos agreed to a peace treaty. In exchange for the Navajos' promise not to engage in further war, the United States established a large reservation for the Navajos in their original homeland in the western United States. Under the 1868 treaty, the Navajo Reservation includes (among other things) the land, the minerals below the land's surface, and the timber on the land, as well as the right to use needed water on the reservation.

The question in this suit concerns "reserved water rights"—a shorthand for the water rights implicitly reserved to accomplish the purpose of the reservation. *Cappaert* v. *United States*, 426 U. S. 128, 138 (1976); see also *Winters* v. *United States*, 207 U. S. 564, 576–577 (1908). The Navajos' claim is not that the United States has *interfered* with their water access. Instead, the Navajos contend that the treaty requires the United States to *take affirmative steps* to secure water for the Navajos—for example, by assessing the Tribe's water needs, developing a plan to secure the needed water, and potentially building pipelines, pumps, wells, or other water infrastructure—either to facilitate better access

DigDeep Right to Water Project et al. by *Elizabeth G. Bentley*; for the Diné Hataałii Association, Inc., by *Patricia Ferguson-Bohnee*; for Historians by *Sam Hirsch, Leonard R. Powell,* and *Amanda L. WhiteEagle*; for the Southern Ute Indian Tribe et al. by *Thomas H. Shipps, Adam T. Reeves, David C. Smith,* and *Lorelyn Hall*; for Tribal Nations et al. by *John E. Echohawk, Steven C. Moore, Morgan E. Saunders, Wesley James Furlong, Heather D. Whiteman Runs Him, Monte Mills,* and *Dylan R. Hedden-Nicely*; for the Ute Indian Tribe of the Uintah and Ouray Reservation by *Frances C. Bassett*; for Lawrence J. MacDonnell et al. by *Burke W. Griggs, pro se*; and for Daniel McCool et al. by *Richard W. Hughes*.

to water on the reservation or to transport off-reservation water onto the reservation. In light of the treaty's text and history, we conclude that the treaty does not require the United States to take those affirmative steps. And it is not the Judiciary's role to rewrite and update this 155-year-old treaty. Rather, Congress and the President may enact— and often have enacted—laws to assist the citizens of the western United States, including the Navajos, with their water needs.

I

The Navajo Tribe is one of the largest in the United States, with more than 300,000 enrolled members, roughly 170,000 of whom live on the Navajo Reservation. The Navajo Reservation is the geographically largest in the United States, spanning more than 17 million acres across the States of Arizona, New Mexico, and Utah. To put it in perspective, the Navajo Reservation is about the size of West Virginia. Two treaties between the United States and the Navajo Tribe led to the establishment of the Navajo Reservation. After the Mexican-American War ended in 1848, the United States acquired control over massive new territory throughout what is now the western United States—spanning west from Texas through New Mexico and Arizona to California, and north into Oklahoma, Kansas, Colorado, Wyoming, Utah, and Nevada. The Navajos lived in a portion of that formerly Mexican territory.

In 1849, the United States entered into a treaty with the Navajos. See Treaty Between the United States of America and the Navajo Tribe of Indians, Sept. 9, 1849, 9 Stat. 974 (ratified Sept. 24, 1850). In that 1849 treaty, the Navajo Tribe recognized that the Navajos were now within the jurisdiction of the United States, and the Navajos agreed to cease hostilities and to maintain "perpetual peace" with the United States. *Ibid.* In return, the United States agreed to "designate, settle, and adjust" the "boundaries" of the Navajo territory. *Id.*, at 975.

Over the next two decades, however, the United States
and the Navajos often were at war with one another.   Dur-
ing that period, the United States forcibly moved many Nav-
ajos from their original homeland to a relatively barren area
in New Mexico known as the Bosque Redondo Reservation.

In 1868, the two sides agreed to a second treaty to put an
end to "all war between the parties."   The United States
"set apart" a large reservation "for the use and occupation
of the Navajo tribe" within the new American territory in
the western United States.   Treaty Between the United
States of America and the Navajo Tribe of Indians, June 1,
1868, 15 Stat. 667–668 (ratified Aug. 12, 1868).   Importantly,
the reservation would be on the Navajos' original homeland,
not the Bosque Redondo Reservation.   The new reservation
would enable the Navajos to once again become self-
sufficient, a substantial improvement from the situation at
Bosque Redondo.   The United States also agreed (among
other things) to build schools, a chapel, and other buildings;
to provide teachers for at least 10 years; to supply seeds and
agricultural implements for up to three years; and to provide
funding for the purchase of sheep, goats, cattle, and corn.

In "consideration of the advantages and benefits con-
ferred" on the Navajos by the United States in the 1868
treaty, the Navajos pledged not to engage in further war
against the United States or other Indian tribes.   *Id.*, at
669–670.   The Navajos also agreed to "relinquish all right
to occupy any territory outside their reservation"—with the
exception of certain rights to hunt.   *Id.*, at 670.   The Nava-
jos promised to "make the reservation" their "permanent
home."   *Id.*, at 671.   In short, the treaty enabled the Nava-
jos to live on their original land.   See Treaty Between the
United States of America and the Navajo Tribe of Indians
With a Record of the Discussions That Led to Its Signing 2,
4, 10–11, 15 (1968).

Under the 1868 treaty, the Navajo Reservation includes
not only the land within the boundaries of the reservation,

Opinion of the Court

but also water rights.   Under this Court's longstanding re-
served water rights doctrine, sometimes referred to as the
*Winters* doctrine, the Federal Government's reservation of
land for an Indian tribe also implicitly reserves the right to
use needed water from various sources—such as ground-
water, rivers, streams, lakes, and springs—that arise on, bor-
der, cross, underlie, or are encompassed within the reserva-
tion.   See *Winters* v. *United States*, 207 U. S. 564, 576–577
(1908); see also *Cappaert* v. *United States*, 426 U. S. 128, 138–
139, 143 (1976); *Arizona* v. *California*, 373 U. S. 546, 598–
600 (1963); F. Cohen, Handbook of Federal Indian Law
§ 19.03(2)(a), pp. 1212–1213 (N. Newton ed. 2012).   Under the
*Winters* doctrine, the Federal Government reserves water
only "to the extent needed to accomplish the purpose of the
reservation."   *Sturgeon* v. *Frost*, 587 U. S. ——, —— (2019)
(internal quotation marks omitted); *United States* v. *New
Mexico*, 438 U. S. 696, 700–702 (1978).

The Navajo Reservation lies almost entirely within the
Colorado River Basin, and three vital rivers—the Colorado,
the Little Colorado, and the San Juan—border the reserva-
tion.   To meet their water needs for household, agricultural,
industrial, and commercial purposes, the Navajos obtain
water from rivers, tributaries, springs, lakes, and aquifers
on the reservation.

Much of the western United States is arid.   Water has
long been scarce, and the problem is getting worse.   From
2000 through 2022, the region faced the driest 23-year period
in more than a century and one of the driest periods in the
last 1,200 years.   And the situation is expected to grow
more severe in future years.   So even though the Navajo
Reservation encompasses numerous water sources and the
Tribe has the right to use needed water from those sources,
the Navajos face the same water scarcity problem that many
in the western United States face.

Over the decades, the Federal Government has taken vari-
ous steps to assist the people in the western States with

their water needs. The Solicitor General explains that, for the Navajo Tribe in particular, the Federal Government has secured hundreds of thousands of acre-feet of water and authorized billions of dollars for water infrastructure on the Navajo Reservation. See Tr. of Oral Arg. 5; see also, *e. g.*, Consolidated Appropriations Act, 2021, Pub. L. 116–260, 134 Stat. 3227, 3230; Northwestern New Mexico Rural Water Projects Act, §§ 10402, 10609, 10701, 123 Stat. 1372, 1395–1397; Central Arizona Project Settlement Act of 2004, § 104, 118 Stat. 3487; Colorado Ute Settlement Act Amendments of 2000, 114 Stat. 2763A–261, 2763A–263; Act of June 13, 1962, 76 Stat. 96; Act of Apr. 19, 1950, 64 Stat. 44–45.

In the Navajos' view, however, those efforts did not fully satisfy the United States's obligations under the 1868 treaty. The Navajos therefore sued the U. S. Department of the Interior, the Bureau of Indian Affairs, and other federal parties. As relevant here, the Navajos asserted a breach-of-trust claim arising out of the 1868 treaty and sought to "compel the Federal Defendants to determine the water required to meet the needs" of the Navajos in Arizona and to "devise a plan to meet those needs." App. 86. The States of Arizona, Nevada, and Colorado intervened against the Tribe to protect those States' interests in water from the Colorado River.

According to the Navajos, the United States must do more than simply not *interfere* with the reserved water rights. The Tribe argues that the United States also must *take affirmative steps* to secure water for the Tribe— including by assessing the Tribe's water needs, developing a plan to secure the needed water, and potentially building pipelines, pumps, wells, or other water infrastructure. See Tr. of Oral Arg. 102 (counsel for Navajo Nation: "I can't say that" the United States's obligation "to ensure access" to water "would never require any infrastructure whatsoever").

The U. S. District Court for the District of Arizona dismissed the Navajo Tribe's complaint. In relevant part, the

District Court determined that the 1868 treaty did not impose a duty on the United States to take affirmative steps to secure water for the Tribe.

The U. S. Court of Appeals for the Ninth Circuit reversed, holding in relevant part that the United States has a duty under the 1868 treaty to take affirmative steps to secure water for the Navajos. *Navajo Nation* v. *United States Dept. of Interior*, 26 F. 4th 794, 809–814 (2022). This Court granted certiorari. 598 U. S. —— (2022).

II

When the United States establishes a tribal reservation, the reservation generally includes (among other things) the land, the minerals below the land's surface, the timber on the land, and the right to use needed water on the reservation, referred to as reserved water rights. See *United States* v. *Shoshone Tribe*, 304 U. S. 111, 116–118 (1938); *Winters* v. *United States*, 207 U. S. 564, 576–577 (1908); see also *Cappaert* v. *United States*, 426 U. S. 128, 138–139 (1976). Each of those rights is a stick in the bundle of property rights that makes up a reservation.

This suit involves water. To help meet their water needs, the Navajos obtain water from, among other sources, rivers, tributaries, springs, lakes, and aquifers on the reservation. As relevant here, the Navajos do not contend that the United States has interfered with their access to water. Rather, the Navajos argue that the United States must take affirmative steps to secure water for the Tribe—for example, by assessing the Tribe's water needs, developing a plan to secure the needed water, and potentially building pipelines, pumps, wells, or other water infrastructure.

The Tribe asserts a breach-of-trust claim. To maintain such a claim here, the Tribe must establish, among other things, that the text of a treaty, statute, or regulation imposed certain duties on the United States. See *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 173–174,

177–178 (2011); *United States* v. *Navajo Nation*, 537 U. S. 488, 506–507 (2003); *United States* v. *Mitchell*, 445 U. S. 535, 542, 546 (1980). The Federal Government owes judicially enforceable duties to a tribe "only to the extent it expressly accepts those responsibilities." *Jicarilla*, 564 U. S., at 177. Whether the Government has expressly accepted such obligations "must train on specific rights-creating or duty-imposing" language in a treaty, statute, or regulation. *Navajo Nation*, 537 U. S., at 506. That requirement follows from separation of powers principles. As this Court recognized in *Jicarilla*, Congress and the President exercise the "sovereign function" of organizing and managing "the Indian trust relationship." 564 U. S., at 175. So the federal courts in turn must adhere to the text of the relevant law—here, the treaty.[1]

In the Tribe's view, the 1868 treaty imposed a duty on the United States to take affirmative steps to secure water for the Navajos. With respect, the Tribe is incorrect. The 1868 treaty "set apart" a reservation for the "use and occupation of the Navajo tribe." 15 Stat. 668. But it contained no "rights-creating or duty-imposing" language that imposed a duty on the United States to take affirmative steps to secure water for the Tribe. *Navajo Nation*, 537 U. S., at 506.

---

[1] The Navajos have suggested that the *Jicarilla* line of cases might apply only in the context of claims seeking damages from the United States pursuant to the Tucker Act and Indian Tucker Act. See 28 U. S. C. §§ 1491, 1505; see also Brief for Navajo Nation 29. But *Jicarilla*'s framework for determining the trust obligations of the United States applies to any claim seeking to impose trust duties on the United States, including claims seeking equitable relief. That is because *Jicarilla*'s reasoning rests upon separation of powers principles—not on the particulars of the Tucker Acts. As *Jicarilla* explains, the United States is a sovereign, not a private trustee, and therefore the trust obligations of the United States to the Indian tribes are established and governed by treaty, statute, or regulation, rather than by the common law of trusts. See 564 U. S., at 165, 177. Stated otherwise, the trust obligations of the United States to the Indian tribes are established by Congress and the Executive, not created by the Judiciary.

Opinion of the Court

Notably, the 1868 treaty did impose a number of specific duties on the United States. Cf. *Jicarilla*, 564 U. S., at 184–185. For example, the treaty required the United States to construct a number of buildings on the reservation, including schools, a chapel, a carpenter shop, and a blacksmith shop. 15 Stat. 668–669. The treaty also mandated that the United States provide teachers for the Navajos' schools for at least 10 years, and provide articles of clothing or other goods to the Navajos. *Id.*, at 669. And the treaty required the United States to supply seeds and agricultural implements for up to three years. *Ibid.*

But the treaty said nothing about any affirmative duty for the United States to secure water. And as this Court has stated, "Indian treaties cannot be rewritten or expanded beyond their clear terms." *Choctaw Nation* v. *United States*, 318 U. S. 423, 432 (1943); cf. *Jicarilla*, 564 U. S., at 173–174, 177–178; *Navajo Nation*, 537 U. S., at 506–507; *Mitchell*, 445 U. S., at 542, 546. So it is here.

Moreover, it would be anomalous to conclude that the United States must take affirmative steps to secure water given that the United States has no similar duty with respect to the land on the reservation. For example, under the treaty, the United States has no duty to farm the land, mine the minerals, or harvest the timber on the reservation—or, for that matter, to build roads and bridges on the reservation. Cf. *id.*, at 542–543. Just as there is no such duty with respect to the land, there likewise is no such duty with respect to the water.

To be sure, this Court's precedents have stated that the United States maintains a general trust relationship with Indian tribes, including the Navajos. *Jicarilla*, 564 U. S., at 176. But as the Solicitor General explains, the United States is a sovereign, not a private trustee, meaning that "Congress may style its relations with the Indians a trust without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is limited or bare compared to a

trust relationship between private parties at common law." *Id.*, at 174 (internal quotation marks omitted). Therefore, unless Congress has created a conventional trust relationship with a tribe as to a particular trust asset, this Court will not "apply common-law trust principles" to infer duties not found in the text of a treaty, statute, or regulation. *Id.*, at 178. Here, nothing in the 1868 treaty establishes a conventional trust relationship with respect to water.

In short, the 1868 treaty did not impose a duty on the United States to take affirmative steps to secure water for the Tribe—including the steps requested by the Navajos here, such as determining the water needs of the Tribe, providing an accounting, or developing a plan to secure the needed water.

Of course, it is not surprising that a treaty ratified in 1868 did not envision and provide for all of the Navajos' current water needs 155 years later, in 2023. Under the Constitution's separation of powers, Congress and the President may update the law to meet modern policy priorities and needs. To that end, Congress may enact—and often has enacted— legislation to address the modern water needs of Americans, including the Navajos, in the West. Indeed, Congress has authorized billions of dollars for water infrastructure for the Navajos. See, *e. g.*, Tr. of Oral Arg. 5, 11; Consolidated Appropriations Act, 2021, Pub. L. 116–260, 134 Stat. 3230.[2]

But it is not the Judiciary's role to update the law. And on this issue, it is particularly important that federal courts not do so. Allocating water in the arid regions of the American West is often a zero-sum situation. See Brief for Western Water Users and Trade Associations as *Amici Curiae*

---

[2] In this Court, the Navajos also briefly point to the 1849 treaty. But that treaty did not grant the Navajos a reservation. In that treaty, the United States agreed to "designate, settle, and adjust" the boundaries of the Navajo territory at some future point. 9 Stat. 975. No provision of the 1849 treaty obligated the United States to take affirmative steps to secure water for the Navajos.

13–14, 18–21.  And the zero-sum reality of water in the West underscores that courts must stay in their proper constitutional lane and interpret the law (here, the treaty) according to its text and history, leaving to Congress and the President the responsibility to enact appropriations laws and to otherwise update federal law as they see fit in light of the competing contemporary needs for water.

## III

The Navajo Tribe advances several other arguments in support of its claim that the 1868 treaty requires the United States to take affirmative steps to secure water for the Navajos.  None is persuasive.

*First*, the Navajos note that the text of the 1868 treaty established the Navajo Reservation as a "permanent home." 15 Stat. 671.  In the Tribe's view, that language means that the United States agreed to take affirmative steps to secure water.  But that assertion finds no support in the treaty's text or history, or in any of this Court's precedents.  The 1868 treaty granted a reservation to the Navajos and imposed a variety of specific obligations on the United States— for example, building schools and a chapel, providing teachers, and supplying seeds and agricultural implements.  The reservation contains a number of water sources that the Navajos have used and continue to rely on.  But as explained above, the 1868 treaty imposed no duty on the United States to take affirmative steps to secure water for the Tribe.  The 1868 treaty, as demonstrated by its text and history, helped to ensure that the Navajos could return to their original land.  See Treaty Between the United States of America and the Navajo Tribe of Indians With a Record of the Discussions That Led to Its Signing 2, 4, 10–11, 15 (1968).

*Second*, the Navajos rely on the provision of the 1868 treaty in which the United States agreed to provide the Tribe with certain "seeds and agricultural implements" for up to three years. 15 Stat. 669.  In the Navajos' view,

those seeds and implements would be unusable without water. But the reservation contains a number of water sources that the Navajos have used and continue to rely on. And the United States's duty to temporarily provide seeds and agricultural implements for three years did not include an additional duty to take affirmative steps to secure water, and to do so indefinitely into the future. If anything, the treaty's express requirement that the United States supply seeds and agricultural implements for a 3-year period—like the treaty's requirement that the United States build schools, a chapel, and the like—demonstrates that the United States and the Navajos knew how to impose specific affirmative duties on the United States when they wanted to do so.

*Third*, the Navajos refer to the lengthy Colorado River water rights litigation that unfolded in a series of cases decided by this Court from the 1960s to the early 2000s, and they note that the United States once opposed the intervention of the Navajos in that litigation. See Response of United States to Motion of Navajo Tribe To Intervene in *Arizona* v. *California*, O. T. 1961, No. 8, Orig. The Navajos point to the United States's opposition as evidence that the United States has control over the reserved water rights. According to the Navajos, the United States's purported control supports their view that the United States owes trust duties to the Navajos. But the "Federal Government's liability" on a breach-of-trust claim "cannot be premised on control alone." *United States* v. *Navajo Nation*, 556 U. S. 287, 301 (2009). Again, the Federal Government must "expressly accep[t]" trust responsibilities in a treaty, statute, or regulation that contains "rights-creating or duty-imposing" language. *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 177 (2011); *United States* v. *Navajo Nation*, 537 U. S. 488, 506 (2003). The Navajos have not identified anything of the sort. In addition, the Navajos may be able to assert the interests they claim in water rights litigation, including by seeking to intervene in cases that affect their

claimed interests, and courts will then assess the Navajos'
claims and motions as appropriate.    See 28 U. S. C. § 1362;
*Arizona* v. *California*, 460 U. S. 605, 615 (1983); see also
*Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 784
(1991); *Moe* v. *Confederated Salish and Kootenai Tribes of
Flathead Reservation*, 425 U. S. 463, 472–474 (1976).[3]

*Fourth*, the Tribe argues that, in 1868, the Navajos would
have understood the treaty to mean that the United States
must take affirmative steps to secure water for the Tribe.
But the text of the treaty says nothing to that effect.    And
the historical record does not suggest that the United States
agreed to undertake affirmative efforts to secure water for
the Navajos—any more than the United States agreed to
farm land, mine minerals, harvest timber, build roads, or con-
struct bridges on the reservation.    The record of the treaty
negotiations makes no mention of any water-related obliga-
tions of the United States at all.    See Treaty Between the
United States of America and the Navajo Tribe of Indians
With a Record of the Discussions That Led to Its Signing.[4]

* * *

The 1868 treaty reserved necessary water to accomplish
the purpose of the Navajo Reservation.    See *Winters* v.
*United States*, 207 U. S. 564, 576–577 (1908).    But the treaty

———————

[3] Similarly, the Navajos argue that the United States's control over the
Colorado River "drives home the duty to secure water."    Brief for Navajo
Nation 33, 40.    But as already explained, the Tribe has failed to identify
any such duty in the 1868 treaty.

[4] The intervenor States separately argue that the Navajo Tribe's
claimed remedies with respect to the Lower Colorado River would inter-
fere with this Court's decree in *Arizona* v. *California*, 547 U. S. 150 (2006).
The question of whether certain remedies would violate the substance of
this Court's 2006 decree is a merits question, not a question of subject-
matter jurisdiction.    Because we conclude that the treaty imposes no duty
on the United States to take affirmative steps to secure water in the first
place, we need not reach the question of whether particular remedies
would conflict with this Court's 2006 decree.

did not require the United States to take affirmative steps to secure water for the Tribe. We reverse the judgment of the U. S. Court of Appeals for the Ninth Circuit.

*It is so ordered.*

Justice Thomas, concurring.

I join the Court's opinion in full, but write separately to highlight an additional and troubling aspect of this suit. For decades, this Court has referred to "a general trust relationship between the United States and the Indian people." *United States* v. *Mitchell*, 463 U. S. 206, 225 (1983); see also *Seminole Nation* v. *United States*, 316 U. S. 286, 296–297 (1942); *Haaland* v. *Brackeen*, 599 U. S. 255, 274–275 (2023). Here, in allowing the Navajo Nation's "breach of trust" claim to go forward, the Ninth Circuit appears to have understood that language as recognizing a generic legal duty of the Federal Government toward Indian tribes or, at least, as placing a thumb on the scale in favor of declaring that legal duties are owed to tribes. See 26 F. 4th 794, 813 (2022). As the Court explains, the Nation has pointed to no source of legally enforceable duties supporting its claim in this suit. But the Ninth Circuit's reasoning reflects deeper problems with this Court's frequent invocation of the Indian "trust relationship."

At the outset, it should be noted that our precedents' "trust" language can be understood in two different ways. In one sense, the term "trust" could refer merely to the trust that Indians have placed in the Federal Government. If that is all this language means, then I have no objection. Many citizens (and foreign nations) trust the Federal Government to do the right thing. Determining how to do right by the competing interests of the country's millions of citizens, however, is generally a job for the political branches, not courts.

By contrast, the term "trust" also has a well-understood meaning at law: a relationship in which a trustee has legally enforceable duties to manage a discrete trust corpus for cer-

tain beneficiaries. See Restatement (Third) of Trusts § 2 (2001). At times, the Federal Government has expressly created such discrete legal trusts for Indians—by, for example, placing parcels of land or specified sums of money into trust. See, *e. g.*, *Cass County* v. *Leech Lake Band of Chippewa Indians*, 524 U. S. 103, 106–107, 114 (1998) (describing statutory grants of authority to place lands in trust for Indians); *Seminole Nation*, 316 U. S., at 293–294 (describing "the Government's promise" in a particular treaty "to establish a $500,000 trust fund" for the Seminole Nation). But, when resolving disputes about those trusts, the Court's "trust" language has gone beyond the discrete terms of those trusts; for example, the Court has alluded generally to "the distinctive obligation of trust incumbent upon the Government in its dealings" with Indians and the Government's "moral obligations of the highest responsibility and trust." *Id.*, at 296–297. In those and other cases, the Court has accordingly blurred the lines between the political branches' general moral obligations to Indians, on the one hand, and specific fiduciary obligations of the Federal Government that might be enforceable in court, on the other. See, *e. g.*, *Mitchell*, 463 U. S., at 225; *Seminole Nation*, 316 U. S., at 296–297; see also *Cobell* v. *Norton*, 240 F. 3d 1081, 1086 (CADC 2001); *Shoshone Indian Tribe of Wind River Reservation* v. *United States*, 364 F. 3d 1339, 1348 (CA Fed. 2004).

In *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162 (2011), the Court took steps to rectify this confusion. There, we explained that the Federal Government is "not a private trustee" but a "sovereign," *id.*, at 173–174, and that "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute," *id.*, at 177. Accordingly, any legal trusts established or duties self-imposed by the Government for a tribe's benefit are "defined and governed by statutes rather than the common law." *Id.*, at 174; see also *id.*, at 173 (emphasizing that "'[t]he *general* relationship between the United States and the Indian tribes is not comparable to a private trust rela-

tionship'"). The Court's opinion today represents a step in the same direction, making clear that tribes' legal claims against the Government must be based on specific provisions of positive law, not merely an amorphous "trust relationship."

However, the Court has also invoked the "trust relationship" to shape at least two other areas of its Indian-law jurisprudence—with questionable results. For example, the Court has identified "the unique trust relationship" with the Indians as the source of pro-Indian "canons of construction" that are supposedly "applicable [only] in Indian law." *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 247 (1985); see also *EEOC* v. *Karuk Tribe Housing Auth.*, 260 F. 3d 1071, 1081 (CA9 2001) (refusing to apply the Age Discrimination in Employment Act of 1967 to tribes in part because of those canons). But it is far from clear how such a trust relationship would support different interpretive tools. The first cases to apply those pro-Indian canons did not ground them in any "trust relationship," but in the more basic idea that ambiguous treaty provisions should be construed against the drafting party. See, *e. g.*, *Patterson* v. *Jenks*, 2 Pet. 216, 229 (1829); *Worcester* v. *Georgia*, 6 Pet. 515, 552 (1832); *The Kansas Indians*, 5 Wall. 737, 760 (1867); Restatement (Second) of Contracts § 206 (1979); Restatement (First) of Contracts § 505 (1932). These canons then "jumped without discussion from the interpretation of treaties to the interpretation of statutes" in the 20th century. A. Barrett, Substantive Canons and Faithful Agency, 90 B. U. L. Rev. 109, 152 (2010). To this day, it remains unclear how the "trust relationship" could justify freestanding pro-Indian canons that authorize courts to depart from the ordinary rules of statutory interpretation.

Next, the Court has also suggested that the "trust relationship" provides the Federal Government with an additional power, not enumerated in the Constitution, to "do all

Thomas, J., concurring

that [is] required" to protect Indians. *Morton* v. *Mancari*, 417 U. S. 535, 552 (1974) (internal quotation marks omitted); see also *Board of County Comm'rs* v. *Seber*, 318 U. S. 705, 715–716 (1943). In doing so, the Court has apparently used the trust relationship to feed into the so-called plenary power that Congress supposedly enjoys over Indian affairs. But the Court has also approved the use of that power to, among other things, restrict tribal sovereignty and "eliminate tribal rights." See *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 343 (1998); *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 501 (1979); *Haaland*, 599 U. S., at 367 (Thomas, J., dissenting). Accordingly, it is difficult to see how such a plenary power could be rooted in a trust relationship with Indians. And it seems at least slightly incongruous to use Indians' trust in the Government as both the basis for a power that can restrict tribal rights and canons of interpretation that favor Indians.

The influence of the "trust relationship" idea on these doctrinal areas is troubling, as the trust relationship appears to lack any real support in our constitutional system. See *id.*, at 358–359. The text of the Constitution (which mentions Indians only in the contexts of commerce and apportionment) is completely silent on any such trust relationship. See Art. I, §§ 2, 8; Amdt. 14, § 2. Further, the trust relationship does not have any historical basis. Its genesis is usually traced to this Court's statement in *Cherokee Nation* v. *Georgia*, 5 Pet. 1 (1831), that the relation of the United States to Indians has "resembl[ed] that of a ward to his guardian," *id.*, at 17; see also F. Cohen, Handbook of Federal Indian Law § 2.02[2], p. 117 (2012) (Cohen). However, that statement was dicta, see *Haaland*, 599 U. S., at 357–359 (Thomas, J., dissenting); and, in any event, the Indian Tribe in that case had a specific treaty calling for the Federal Government's "protection," *Cherokee Nation*, 5 Pet., at 17. Some treaties with tribes

have contained similar provisions; others have not. Compare Treaty With the Wyandots, 7 Stat. 31, with Treaty With the Mohawks, 7 Stat. 61. And, of course, some tribes before and after the Founding engaged in warfare with the Federal Government. Cohen § 1.03[2], at 36; *id.*, § 1.03[3], at 40. In short, the idea of a generic trust relationship with all tribes—to say nothing of legally enforceable fiduciary duties—seems to lack a historical or constitutional basis.

In future cases, we should clarify the exact status of this amorphous and seemingly ungrounded "trust relationship." As a start, it would be helpful to acknowledge that many of this Court's statements about the trust relationship were mere dicta. *E. g.*, *Seminole Nation*, 316 U. S., at 293–294 (discrete trust); *Mancari*, 417 U. S., at 551–552 (equal protection challenge to Government hiring program); *Seber*, 318 U. S., at 707 (state taxes on Indian lands). In the meantime, however, the Court should take care to ensure that this confusion does not spill over into yet further areas of the law.

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON join, dissenting.

Today, the Court rejects a request the Navajo Nation never made. This case is not about compelling the federal government to take "*affirmative steps* to secure water for the Navajos." *Ante*, at 558. Respectfully, the relief the Tribe seeks is far more modest. Everyone agrees the Navajo received enforceable water rights by treaty. Everyone agrees the United States holds some of those water rights in trust on the Tribe's behalf. And everyone agrees the extent of those rights has never been assessed. Adding those pieces together, the Navajo have a simple ask: They want the United States to identify the water rights it holds for them. And if the United States has misappropriated the Navajo's water rights, the Tribe asks it to formulate a plan to stop doing so prospectively. Because there is nothing re-

GORSUCH, J., dissenting

markable about any of this, I would affirm the Ninth Circuit's judgment and allow the Navajo's case to proceed.

## I

Understanding this lawsuit requires at least three pieces of context the Court's opinion neglects. It requires some understanding of the history that led to the Treaty of 1868 establishing the Navajo Reservation. It requires some insight into the discussions that surrounded that Treaty. Finally, it requires an appreciation of the many steps the Navajo took to avoid this litigation.

## A

For centuries, the Navajo inhabited a stretch of land in "present-day northwestern New Mexico, northeastern Arizona, and the San Juan drainage beyond." J. Kessell, General Sherman and the Navajo Treaty of 1868: A Basic and Expedient Misunderstanding, 12 W. Hist. Q. 251, 253 (1981) (Kessell). This ancestral home was framed by "four mountains and four rivers" the Tribe considered sacred. Treaty Between the United States of America and the Navajo Tribe of Indians, With a Record of the Discussions That Led to Its Signing 2 (1968) (Treaty Record); see also E. Rosser, Ahistorical Indians and Reservation Resources, 40 Env. L. 437, 445 (2010). There, tribal members "planted their subsistence crops," "hunted and gathered," and "r[an] their livestock" over the plains. Kessell 253.

In the 1860s, that way of life changed forever. In the aftermath of the Mexican-American War—and following a period of rapid westward expansion—the United States found itself embroiled in a series of bitter conflicts with the Navajo. P. Iverson, Diné: A History of the Navajos 37–48 (2002) (Iverson). Eventually, the United States tasked James Henry Carleton with resolving them. *Id.*, at 47–48. "Determined to bring an end to Native resistance in the ter-

ritory," he elected for a program of "removal, isolation, and incarceration." *Id.*, at 48. He hoped that time on a reservation would teach the Navajo "'the art of peace,'" and that, while confined, they might "'acquire new habits, new values, new modes of life.'" *Id.*, at 49. In time, he imagined, "'the old Indians will die off and carry with them the latent longings for murder and robbing; the young ones will take their places without these longings: and thus, little by little, they will become a happy and contented people.'" *Ibid.* This vision found support from others in the federal government. As Commissioner of Indian Affairs William P. Dole put it in his annual report, the situation with the Navajo "'demand[ed] the earliest possible interposition of the military force of the government.'" *Ibid.* In his view, only putting the Navajo on a "'suitable reservatio[n]'" would end their "'wild and predatory life.'" *Ibid.*

In settling on this plan, the federal government had goals in mind beyond reducing conflict. As Carleton explained, "'[b]y the subjugation and colonization of the Navajo [T]ribe we gain for civilization their whole country, which is much larger in extent than the [S]tate of Ohio, and, besides being the best pastoral region between the two oceans, is said to abound in the precious as well as [other] useful metals.'" *Id.*, at 50. The "'exodus of this whole people from the land of their fathers'" would be, he imagined, "'a touching sight.'" *Ibid.* But no matter. He saw it as the Navajo's "'destiny'" to "'give way to the insatiable progress of our race.'" *Ibid.*

Removal demanded finding a new home for the Tribe. Carleton picked the location himself: an area hundreds of miles from the Navajo's homeland "commonly called the Bosque Redondo." *Ibid.*; see also Kessell 254. Warning signs flashed from the start. Officers tasked with surveying the site cautioned that it was "'remote'" from viable "'forage'" and that "'[b]uilding material'" would have to come from a significant distance. Iverson 50. Worse, they found that

the water supply was meager and contained "'much unhealthy mineral matter.'" *Ibid.*; see also Kessell 269. Carleton ignored these findings and charged ahead with his plan. Iverson 50.

That left the not-so-small matter of securing the Navajo's compliance. To that end, the federal government unleashed a "maelstrom of destruction" on the Tribe. *Id.*, at 51. Before all was said and done, "the Navajo had to be literally starved into surrender." 2 Hearing before the U. S. Commission on Civil Rights, Office of General Counsel, Demographic and Socio-Economic Characteristics of the Navajo 6 (1973) (Commission Report). "[T]housands of U. S. troops roamed the Navajo [Country] destroying everything the Navajo could use; every field, storehouse, and hut was burned." *Ibid.* The campaign was "brief, blunt, and, when combined with a particularly difficult winter," effective. Iverson 51. By the winter of 1863–1864, most of the Navajo had surrendered. Commission Report 6–7; see also Iverson 51.

That period of violence led to "the Long Walk." In truth, it was not one walk but many—over 53 separate incidents, according to some. *Id.*, at 52. In each case, federal officers rounded up tribal members, "[h]erded [them] into columns," and marched them hundreds of miles from their home. Kessell 254. "Many died en route, some shot by the souldiers." Commission Report 7. As one Navajo later recounted, people were killed "'on the spot if they sa[id] they [were] tired or sick or if they stop[ped] to help someone.'" Iverson 55. Still "[o]thers fell victim to slavers with the full complicity of the U. S. officials." Commission Report 7.

Those who survived wound up at "a destination that surpassed their fears." Iverson 52. Bosque Redondo was just what the officers had warned: a "semiarid, alkaline, fuel-stingy, insect-infested environment." Kessell 255. And, just as they predicted, water proved a serious issue. The Tribe was forced to rely on a "'little stream winding through

an immense plain.'" Iverson 59. But its "water was bad." Kessell 259. No surprise, then, that "[o]nly half the land under cultivation at the Bosque was productive." *Ibid.* No surprise either that even the productive land yielded "one disastrous crop failure after another." *Id.*, at 255. Further feeding the crisis, Carleton "badly underestimated the number of Navajos who would end up at the Bosque Redondo." *Ibid.* All told, the relocation proved a "catastrophe for the Navajo; 2,000 died there in four years." Commission Report 8.

## B

"By 1868 even the U. S. government could see" that the present conditions could not persist. *Ibid.* So it set out to relocate the Navajo once more. To that end, the United States sent members of the Indian Peace Commission to negotiate a new treaty with the Tribe. Kessell 257–258. Led by General William Tecumseh Sherman, the Commission disfavored allowing the Navajo to return to their homeland. *Ibid.* Doing that, the Commission feared, risked rekindling old hostilities. *Id.*, at 257. So Sherman tried to persuade the Navajo to relocate someplace else. Understanding the importance of water to the Navajo, he offered them assurances that other locations would have "plenty of water." Treaty Record 5.

The Navajo would have none of it. Their lead negotiator, Barboncito, refused to "go to any other country except [his] own." *Ibid.* Any place else, he said, could "turn out another Bosque Redondo." *Id.*, at 5–6. "[O]utside [our] own country," Barboncito told Sherman, "we cannot raise a crop, but in it we can raise a crop almost anywhere." *Id.*, at 3. "[W]e know this land does not like us," he said of Bosque Redondo, and "neither does the water." *Ibid.* Along the way, he spoke of "the heart of Navajo country," which he described as including a place where "the water flows in abundance." *Id.*, at 8. In the end, "[t]he will of the Nava-

jos—personified in the intense resolve of Barboncito," won out. Kessell 259. Sherman came to realize that, if he left the Navajo at Bosque Redondo, the dire conditions—including "'the foul character of [the] water'"—would eventually induce them to drift away from the encampment. *Id.*, at 260. And the Navajo flatly refused to move to some other unfamiliar place. *Ibid.*

Arriving at that conclusion proved simple enough; arriving upon a treaty proved more challenging. There was, of course, no small power asymmetry. As one Senator noted at the time, it was a curious feature that the Commissioners set out to "'conclude a treaty with Indians'" who were at that very moment being "'held on a reservation against their will.'" *Id.*, at 259. Language barriers presented complications too. Messages had to be translated twice—first from English to Spanish, and then from Spanish to Navajo. *Id.*, at 261. Aggravating matters, the parties saw the world very differently. The United States' representatives "spoke of artificial lines on maps, of parallels and meridians"; the Navajo spoke "of geographical features, of canyons, mountains, and mesas." *Ibid.* The United States' representatives "talked about ownership and a claim to the land"; the Navajo talked about "using the land." *Ibid.* As a result, the parties often "misunderstood each other." *Ibid.* And whether intentionally or inadvertently, Sherman "misled" the Navajo about, among other things, the size of their reservation. *Id.*, at 263. He promised twice the land that they received in the final accounting. *Ibid.*

In the end, the Treaty of 1868 provided the Navajo less land per capita—two-thirds less—than the other Tribes the Indian Peace Commission would go on to negotiate with. *Id.*, at 268. It seems that owed, in no small part, to the negotiators' understanding that the Navajo had "already experienced irrigation agriculture" and could plausibly get by with less. *Ibid.* Indeed, when providing instructions to

the Indian Peace Commission about how they should negotiate with the Navajo, the Secretary of the Interior discussed the possibility of agriculture as bearing on the appropriate size of the Tribe's reservation. Unlike the Navajo, he thought, " '[w]ild Indians cannot at once be transformed into farmers. They must pass through the intermediate stage of herdsmen. They must first become pastoral, then agricultural.' " *Id.*, at 269.

Despite all this, "[f]or the Navajos the treaty signified not defeat, but victory, and not disappearance, but continuation." Iverson 36. "The agreement allowed [them] to return to a portion of their home country." *Ibid.* Nor would that "portion" remain so confined. The Navajo often struggled to stay on the narrow tract of land the United States provided. Commission Report 9. In practice, the federal government often tolerated (and sometimes encouraged) the Navajo to live and tend to livestock off reservation to preserve their self-sufficiency. Kessell 271. These arrangements continued until the 1930s, when Congress first "enact[ed] legislation defining the exterior boundaries of the Navajo Reservation." *Id.*, at 272. Over the ensuing decades, Congress would go on to extend the reservation's boundaries repeatedly. See, *e. g.*, Act of June 14, 1934, 48 Stat. 960; Act of Feb. 21, 1931, ch. 269, 46 Stat. 1204; Act of May 23, 1930, ch. 317, 46 Stat. 378.

C

Fast forward to the present. Today, the Navajo Reservation has become "the largest Indian reservation in the United States," with over "17 million acres," and over "300,000 members." App. 90. Its western boundary runs alongside a vast stretch of the Colorado River. *Id.*, at 91. Yet even today, water remains a precious resource. "Members of the Navajo Nation use around 7 gallons of water per day for all of their household needs"—less than one-tenth the amount the average American household uses. *Id.*, at 101. In some parts of the reservation, as much as 91% of Navajo households "lack access to water." *Id.*, at 102.

GORSUCH, J., dissenting

That deficit owes in part to the fact that no one has ever assessed what water rights the Navajo possess. For instance, "[a]lthough the Navajo Reservation is adjacent to the Colorado River, the Navajo Nation's rights to use water from the Colorado River" have never been adjudicated. *Id.*, at 36. The United States acknowledges that it holds certain water rights "in trust" for the Navajo. See Tr. of Oral Arg. 26, 40. It does not dispute that it exercises considerable control over the disposition of water from the Colorado River. And it concedes that the Navajo's water rights "may . . . include some portion of the mainstream of the Colorado." *Id.*, at 33. But instead of resolving what the Navajo's water rights might be, the United States has sometimes resisted efforts to answer that question.

The current legal regime governing the Colorado River began with a 1922 interstate compact between seven States. That agreement split the Colorado into two basins—an Upper Basin and a Lower Basin. See Colorado River Compact, Art. II, Colo. Rev. Stat. §37–61–101 (2022). The compact answered some high-level questions about which States could lay claim to which sections of the river. But it did not purport to "affec[t] the obligations of the United States of America to Indian [T]ribes." *Id.*, Art. VII. In that way, it left the Navajo with no insight into what water they could claim as their own.

Six years later, Congress entered the picture by passing the Boulder Canyon Project Act, 45 Stat. 1057, codified at 43 U. S. C. §§617–619b. That Act had a profound impact on the Lower Basin. It authorized the construction of the Hoover Dam and the creation of Lake Mead. §617. More than that, it gave the Secretary of the Interior substantial power to divvy up the resulting impounded water. Failing agreement among the States in the region, the law authorized the Secretary to enter into contracts for the delivery of water and provided that "[n]o person" may have water from the mainstream of the Colorado in the Lower Basin "except by contract." §617d; see also *Arizona* v. *California*, 373 U. S.

546, 565 (1963) (*Arizona I*).   In adopting this law, Congress hoped "to put an end to the long-standing dispute over Colorado River waters."   *Id.*, at 560.

Reality never quite caught up to the law's ambitions. After an agreement among the States failed to emerge and the Secretary began issuing contracts to various users, Arizona in 1952 brought an original action in this Court against California seeking a declaration of its water rights in the Lower Basin.   *Id.*, at 550–551.   Several other States intervened.   *Ibid.*   So did the United States.   *Ibid.*   In doing so, the federal government claimed the need to "protect federal interests, including the rights of the Navajo Nation and twenty-four other Indian [T]ribes in the Lower Basin." App. 104.   As the litigation unfolded, however, the Navajo began to worry that the United States did not have their best interests in mind.   In 1956, the Navajo Nation sought leave to file (along with six other Tribes) a motion seeking "to define the scope of the representation of the [T]ribes by the United States" and objecting to what they considered a "lack of effective representation and [a] conflict of interest." *Id.*, at 105.   That motion was denied.   *Ibid.*

Proceeding without the Navajo, this Court referred the litigation to a Special Master.   In time, the Special Master prepared a report and recommendation that omitted any mention of the Tribe.   *Ibid.*   In response, the Navajo wrote to the Attorney General.   They asked the United States to object to the Special Master's report on their behalf.   *Id.*, at 105–106.   The Navajo say they never received a response. *Id.*, at 106.   For its part, the United States eventually did object—but not on the grounds the Navajo sought.   *Ibid.*

Having seen enough, the Navajo in 1961 moved to intervene.   *Ibid.*   They "argued that the United States had failed to vigorously assert" their interests.   *Ibid.*   More than that, the Tribe contended, the United States had "'abandoned the case so far as the adjudication of the rights of the Navajo Indians [was] concerned.'"   *Ibid.*   The United

States opposed the Tribe's motion. *Ibid.* On its view, it had already "'undertaken representation of the interests of several Indian [T]ribes,'" so there was no need for the Court to hear from the Navajo. *Id.*, at 107. In any event, the United States assured the Court, it would continue to apply "'considerations of justice'" in its dealings with the Tribe. *Ibid.* The government conceded, however, "no evidence had been submitted on behalf of the Navajo Nation for uses from the mainstream." *Ibid.* And it conceded that "such evidence would have had to be submitted in order for the Court to consider the issue of the Navajo Nation's rights to the mainstream." *Ibid.* As with their previous attempts to make their voices heard in the litigation, the Navajo's motion to intervene was denied. *Id.*, at 108.

In 1964, the litigation Arizona initiated more than a decade earlier culminated in a decree. See *Arizona* v. *California*, 376 U. S. 340. It allocated the Lower Basin Colorado River mainstream among various parties—including five other Tribes whose interests the United States did assert. See *id.*, at 344–345. The decree also permitted the federal government to release water pursuant to certain "valid contracts" and applicable federal laws. *Id.*, at 343; Brief for Federal Parties 7. But the Tribe's rights remained in limbo. The United States never asserted any rights on the Navajo's behalf; the Navajo never received an opportunity to assert them for themselves. Since 1964, the decree governing the Lower Basin has been modified at various points. See, *e. g.*, *Arizona* v. *California*, 547 U. S. 150 (2006); *Arizona* v. *California*, 531 U. S. 1 (2000); *Arizona* v. *California*, 466 U. S. 144 (1984). But it has never been modified to address the Navajo.

In the intervening years, the Navajo have asked the federal government—repeatedly—to assess their rights in the mainstream of the Colorado. App. 109. In response to those inquiries, the Tribe received a letter from the Department of the Interior indicating that the Department still had

not made "any decisions" about what water rights, if any, the Navajo may have in the river. *Id.*, at 110. The Department posited that figuring that out would be a "somewhat lengthy process," one that had "yet to be initiated." *Ibid.*

Unwilling to wait indefinitely, the Navajo eventually filed this suit. In it, the Navajo sought "injunctive and declaratory relief to compel the Federal Defendants to determine the water required to meet the needs of the Nation's lands in Arizona and devise a plan to meet those needs to fulfill the promise of the United States to make the Nation's Reservation lands a permanent homeland for the Navajo people." *Id.*, at 86. In other words, the Tribe asked the United States to assess what water rights it holds in trust on the Tribe's behalf pursuant to the Treaty of 1868. Tr. of Oral Arg. 71–72. And if it turns out the United States has misappropriated those water rights, the Tribe wants the federal government to come up with a plan to set things right.

## II

With a view of this history, the proper outcome of today's case follows directly. The Treaty of 1868 promises the Navajo a "permanent home." Treaty Between the United States of America and the Navajo Tribe of Indians, June 1, 1868, Art. XIII, 15 Stat. 671 (ratified Aug. 12, 1868) (Treaty of 1868). That promise—read in conjunction with other provisions in the Treaty, the history surrounding its enactment, and background principles of Indian law—secures for the Navajo some measure of water rights. Yet even today the extent of those water rights remains unadjudicated and therefore unknown. What is known is that the United States holds some of the Tribe's water rights in trust. And it exercises control over many possible sources of water in which the Tribe may have rights, including the mainstream of the Colorado River. Accordingly, the government owes the Tribe a duty to manage the water it holds for the Tribe in a legally responsible manner. In this lawsuit, the Navajo

ask the United States to fulfill part of that duty by assessing what water rights it holds for them. The government owes the Tribe at least that much.

## A

Begin with the governing legal principles. Under our Constitution, "all Treaties made" are "the supreme Law of the Land." Art. VI, cl. 2. Congress can pass laws to implement those treaties, see, *e. g., Bond* v. *United States*, 572 U. S. 844, 851, 855 (2014), and the Executive Branch can act in accordance with them, see, *e. g., Fok Yung Yo* v. *United States*, 185 U. S. 296, 303 (1902). But the Judiciary also has an important role to play. The Constitution extends "[t]he judicial Power" to cases "arising under . . . Treaties made, or which shall be made." Art. III, §2, cl. 1. As a result, this Court has recognized that Tribes may sue to enforce rights found in treaties. See *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463, 472–477 (1976). Other branches share the same understanding. In enacting the Indian Trust Asset Reform Act of 2016, Congress confirmed its belief that "commitments made through written treaties" with the Tribes "established enduring and *enforceable* Federal obligations" to them. 25 U. S. C. §5601(4)–(5) (emphasis added). The Executive Branch has likewise and repeatedly advanced the position— including in this very litigation—that "a treaty can be the basis of a breach-of-trust claim" enforceable in federal court. Brief for Federal Parties 22–23, n. 5.

What rights does a treaty secure? A treaty is "essentially a contract between two sovereign nations." *Washington* v. *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658, 675 (1979). So a treaty's interpretation, like "a contract's interpretation, [is] a matter of determining the parties' intent." *BG Group plc* v. *Republic of Argentina*, 572 U. S. 25, 37 (2014). That means courts must look to the "shared expectations of the contracting

parties." *Air France* v. *Saks*, 470 U. S. 392, 399 (1985). All
with an eye to ensuring both sides receive the "benefit
of their bargain." *Mobil Oil Exploration & Produc-
ing Southeast, Inc.* v. *United States*, 530 U. S. 604, 621
(2000).

That exercise entails the application of familiar principles
of contract interpretation. Those principles include an im-
plied covenant of "the utmost good faith" and fair dealing
between the parties. *Sullivan* v. *Kidd*, 254 U. S. 433, 439
(1921). They include the doctrine of *contra proferentem*—
the principle that any uncertainty in a contract should be
construed against the drafting party. See *Lamps Plus, Inc.*
v. *Varela*, 587 U. S. ——, —— – —— (2019); see also 1 Oppen-
heim's International Law 1279 (R. Jennings & A. Watts eds.,
9th ed. 1992). And they include the doctrine of unilateral
mistake—the notion that, if two parties understand a key
provision differently, the controlling meaning is the one held
by the party that could not have anticipated the different
meaning attached by the other. See Restatement (Second)
of Contracts § 201(2) (1979).

Still other doctrines impose a "higher degree of scrutiny"
on contracts made between parties sharing a fiduciary rela-
tionship, given the risk the fiduciary will (intentionally or
otherwise) "misuse" its position of trust. 28 R. Lord, Willis-
ton on Contracts § 71:53, p. 617 (4th ed. 2020). When it
comes to the United States, such fiduciary duties must, of
course, come from positive law, "not the atmosphere." *Haa-
land* v. *Brackeen*, 599 U. S. 255, 273 (2023). But the
United States has, through "acts of Congress" and other af-
firmative conduct, voluntarily assumed certain specific fidu-
ciary duties to the Tribes. *Seminole Nation* v. *United
States*, 316 U. S. 286, 287, 297 (1942). That raises the spec-
ter of undue influence—especially since, in many negotia-
tions with the Tribes, the United States alone had "repre-
sentatives skilled in diplomacy" who were "masters of [its]
written language," who fully "underst[ood] the . . . technical
estates known to [its] law," and who were "assisted by an

interpreter [they] employed." *Jones* v. *Meehan*, 175 U. S. 1, 11 (1899).

Put together, these insights have long influenced the interpretation of Indian treaties. "The language used in treaties with the Indians should never be construed to their prejudice." *Worcester* v. *Georgia*, 6 Pet. 515, 582 (1832) (McLean, J., concurring). Rather, when a treaty's words "are susceptible of a more extended meaning than their plain import," we must assign them that meaning. *Ibid.* Our duty, this Court has repeatedly explained, lies in interpreting Indian treaties "in a spirit which generously recognizes the full obligation of this [N]ation." *Tulee* v. *Washington*, 315 U. S. 681, 684–685 (1942); see also *United States* v. *Winans*, 198 U. S. 371, 380–381 (1905); *Choctaw Nation* v. *United States*, 119 U. S. 1, 27–28 (1886). We sometimes call this interpretive maxim—really just a special application of ordinary contract-interpretation principles—the Indian canon. See F. Cohen, Handbook of Federal Indian Law §2.02, p. 119 (N. Newton ed. 2005); R. Collins, Never Construed to Their Prejudice: In Honor of David Getches, 84 U. Colo. L. Rev. 1, 6–7 (2013).

With time, too, these interpretive insights have yielded some more concrete rules. First, courts must "give effect to the terms" of treaties as "the Indians themselves would have understood them." *Minnesota* v. *Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 196 (1999); see also *Tulee*, 315 U. S., at 684. Second, to gain a complete view of the Tribes' understanding, courts may (and often must) "look beyond the written words to the larger context that frames the Treaty." *Mille Lacs Band*, 526 U. S., at 196. That includes taking stock of "the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation* v. *United States*, 318 U. S. 423, 432 (1943). Third, courts must assume into those treaties a duty of "good faith" on the part of the United States to "protec[t]" the Tribes and their ways of life. See *Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U. S., at 666–667.

It is easy to see the purchase these rules have for reservation-creating treaties like the one at issue in this case. Treaties like that almost invariably designate property as a permanent home for the relevant Tribe. See *McGirt* v. *Oklahoma*, 591 U. S. ——, —— (2020). And the promise of a permanent home necessarily implies certain benefits for the Tribe (and certain responsibilities for the United States). One set of those benefits and responsibilities concerns water. This Court long ago recognized as much in *Winters* v. *United States*, 207 U. S. 564 (1908).

That case involved the Milk River, which flows along the northern border of the Fort Belknap Reservation. *Id.*, at 565–567 (statement of McKenna, J.). Upstream landowners invested their own resources to build dams and reservoirs which indirectly deprived the Tribes living on the reservation of water by reducing the volume available downstream. *Id.*, at 567. The United States sued on the Tribes' behalf to enjoin the landowners' actions. *Id.*, at 565. In assessing the government's claim, the Court looked to the agreement establishing that reservation and found no language speaking to the Tribes' water rights at all. *Id.*, at 575–576. Nevertheless, the Court concluded, the agreement reserved water rights for the Tribes in the Milk River and found for the government. *Id.*, at 577. The Court considered it inconceivable that, having once enjoyed "beneficial use" of nearby waters, the Tribes would have contracted to "give up all th[at]." *Id.*, at 576. After all, the lands described in the reservation "were arid and, without irrigation, were practically valueless," and "communities could not be established" without access to adequate water. *Ibid.* (internal quotation marks omitted). For these reasons, the agreement's provisions designating the land as a permanent home for the Tribes necessarily implied that the Tribes would enjoy continued access to nearby sources of water. *Ibid.* A contrary reading, the Court said, would "impair or defeat" the parties' agreement. *Id.*, at 577.

While *Winters* involved a claim brought by the United States, the federal government asserted "the rights of the Indians" themselves. *Id.*, at 576. This Court's subsequent cases have confirmed as much. In *United States* v. *Powers*, 305 U. S. 527 (1939), for instance, this Court cited *Winters* as authority for its holding that a different treaty impliedly "reserved" waters "for the equal benefit *of tribal members*." *Id.*, at 532 (emphasis added). So when the reservation was dissolved and the land allotted, "the right to use some portion of tribal waters essential for cultivation passed *to the owners*" of the individual plots of land. *Ibid.* (emphasis added). Later, in *Arizona I*, this Court described *Winters* as standing for the principle that "the Government, when it create[s an] Indian Reservation, intend[s] to deal fairly with the Indians by reserving *for them* the waters without which their lands would have been useless." 373 U. S., at 600 (emphasis added). Congress would not "creat[e] an Indian Reservation without intending to reserve waters necessary to make the reservation livable." *Id.*, at 559.

Sometimes the United States may hold a Tribe's water rights in trust. When it does, this Court has recognized, the United States must manage those water rights "[a]s a fiduciary," *Arizona* v. *California*, 460 U. S. 605, 626–627 (1983) (*Arizona II*), one held to "the most exacting fiduciary standards," *Seminole Nation*, 316 U. S., at 297. This is no special rule. "[F]iduciary duties characteristically attach to decisions" that involve "managing [the] assets and distributing [the] property" of others. *Pegram* v. *Herdrich*, 530 U. S. 211, 231 (2000). It follows, then, that a Tribe may bring an action in equity against the United States for "fail[ing] to provide an accurate accounting of" the water rights it holds on a Tribe's behalf. *United States* v. *Tohono O'odham Nation*, 563 U. S. 307, 318 (2011). After all, it is black-letter law that a plaintiff may seek an accounting "whenever the defendant is a fiduciary who has been entrusted with property of some kind belonging to the plaintiff," even if the de-

fendant is not "express[ly]" named a "trustee."   J. Eichen-grun, Remedying the Remedy of Accounting, 60 Ind. L. J. 463, 468–469, and n. 18 (1985) (noting cases); see also A. New-man, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 967, p. 201 (3d ed. 2010) ("fiduciary relationship [is] suffi-cient to support an action for an accounting" whenever the fiduciary exercises "discretion over trust" assets).

B

With these principles in mind, return to the Navajo's case and start with the most basic terms of the parties' agree-ment.   In signing the Treaty of 1868, the Navajo agreed to "relinquish all right to occupy any territory outside their res-ervation."   Art. IX, 15 Stat. 670.   In exchange, the Navajo were entitled to "make the reservation . . . their permanent home."   Art. XIII, *id.*, at 671.   Even standing alone, that language creates enforceable water rights under *Winters*. As both parties surely would have recognized, no people can make a permanent home without the ability to draw on ade-quate water.   Otherwise, the Tribe's land would be "practi-cally valueless," "defeat[ing] the declared purpose" of the Treaty.   *Winters*, 207 U. S., at 576–577.

Other clues make the point even more obvious.   Various features of the Treaty were expressly keyed to an assump-tion about the availability of water.   The United States agreed to build certain structures "within said reservation, where . . . water may be convenient."   Art. III, 15 Stat. 668. Under the Treaty's terms, too, individual Navajo were enti-tled to select tracts of land within the reservation to "com-mence farming" and for "purposes of cultivation."   Art. V, *ibid.*   If an individual could show that he "intend[ed] in good faith to commence cultivating the soil for a living," the Treaty entitled him to "receive seeds and agricultural imple-ments."   Art. VII, *id.*, at 669.   Similarly, the Treaty prom-ised large numbers of animals to the Tribe.   Art. XII, *id.*, at 670.   Those guarantees take as a given that the Tribe

GORSUCH, J., dissenting

could access water sufficient to live, tend crops, and raise animals in perpetuity.

As we have seen, "the history of the treaty, the negotiations, and the practical construction adopted by the parties" may also inform a treaty's interpretation. *Choctaw Nation*, 318 U. S., at 432. And here history is particularly telling. Much of the Navajo's plight at Bosque Redondo owed to both the lack of water and the poor quality of what water did exist. General Sherman appreciated this point and expressly raised the availability of water in his negotiations with the Tribe. Treaty Record 5. Doubtless, he did so because everyone had found the water at Bosque Redondo insufficient and because the Navajo's strong desire to return home rested in no small part on the availability of water there. *Id.*, at 3, 8. Because the Treaty of 1868 must be read as the Navajo "themselves would have understood" it, *Mille Lacs Band*, 526 U. S., at 196, it is impossible to conclude that water rights were not included. Really, few points appear to have been *more* central to both parties' dealings.

What water rights does the Treaty of 1868 secure to the Tribe? Remarkably, even today no one knows the answer. But at least we know the right question to ask: How much is required to fulfill the purposes of the reservation that the Treaty of 1868 established? See *Nevada* v. *United States*, 463 U. S. 110, 116, n. 1 (1983) (citing cases). We know, too, that a Tribe's *Winters* rights are not necessarily limited to the water sources found within the corners of their reservation. *Winters* itself involved a challenge to the misappropriation of water by upstream landowners from a river that ran along the border of tribal lands. 207 U. S., at 576. And here the Navajo's Reservation likewise stands adjacent to a long stretch of the Colorado River flowing through both its Upper and Lower Basins. App. 91. Finally, we know that "it is impossible to believe that when . . . the Executive Department of this Nation created the [various] reservations"

in the arid Southwest it was "unaware that . . . water from the [Colorado R]iver would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Arizona I*, 373 U. S., at 598–599. Nor does the United States dispute any of this. To the contrary, it acknowledges that the Navajo's water rights very well "may . . . include some portion of the mainstream of the Colorado" that runs adjacent to their reservation. Tr. of Oral Arg. 33.

For our purposes today, that leaves just one question: Can the Tribe state a legally cognizable claim for relief asking the United States to assess what water rights they have? Not even the federal government seriously disputes that it acts "as a fiduciary" of the Tribes with respect to tribal waters it manages. *Arizona II*, 460 U. S., at 627–628. Indeed, when it comes to the Navajo, the United States freely admits that it holds certain water rights for the Tribe "in trust." Tr. of Oral Arg. 40. And of course, that must be so given that the United States exercises pervasive control over much water in the area, including in the adjacent Colorado River. See *Arizona I*, 373 U. S., at 564–565.

Those observations suffice to resolve today's dispute. As we have seen, that exact coupling—a fiduciary relationship to a specific group and complete managerial control over the property of that group—gives rise to a duty to account. See *supra*, at 16–17. The United States, we know, must act in a "legally [a]dequate" way when it comes to the Navajo's water it holds in trust. *Arizona II*, 460 U. S., at 627. It follows, as the United States concedes, that the federal government could not "legally" dam off the water flowing to their Reservation, as doing so would "interfere with [the Tribe's] exercise of their" water rights. Tr. of Oral Arg. 13. Implicit in that concession is another. Because *Winters* rights belong to the Navajo themselves, the United States cannot lawfully divert them elsewhere—just as a lawyer can-

not dispose of a client's property entrusted to him without permission. And the *only* way to ensure compliance with that obligation is to give the Tribe just what they request— an assessment of the water rights the federal government holds on the Tribe's behalf.

## III

The Court does not dispute most of this. It agrees that the Navajo enjoy "water rights implicitly reserved to accomplish the purpose of the reservation." *Ante*, at 558. It agrees that the United States cannot lawfully interfere with those water rights. *Ante*, at 558, 562, 563. And it leaves open the possibility that the Navajo "may be able to assert the interests they claim in water rights litigation." *Ante*, at 568. Really, the Court gets off the train just one stop short. It insists (and then repeats—again and again) that the United States owes no "affirmative duty" to the Navajo with respect to water, and therefore does not need to take any "affirmative steps" to help the Tribe on that score. *Ante*, at 558, 562–569. This reasoning reflects three errors.

### A

The Court begins by misapprehending the nature of the Navajo's complaint. Though it never quite cashes out what the phrase "affirmative steps" means, the Court appears concerned that allowing this complaint to proceed could result in a court order requiring the United States to "buil[d] pipelines, pumps, wells, or other water infrastructure." *Ante*, at 558, 562, 563. More than that, the Court worries that— if a lower court finds that the United States has any water-related responsibilities to the Tribe—the federal government might even eventually find itself on the hook to "farm land, mine minerals, harvest timber, build roads, or construct bridges on the reservation." *Ante*, at 569; see also *ante*, at 565.

The Tribe's lawsuit asks for nothing of the sort. The Tribe expressly disavows any suggestion that, "as a matter of treaty interpretation . . . the United States is legally obligated to pay for pipelines or aquifers," for example. Tr. of Oral Arg. 78. Instead and again, the Tribe's complaint seeks simply to "compel the Federal Defendants to determine the water required to . . . fulfill the promise[s]" made to them under the Treaty of 1868. App. 86. Only if the United States is, in fact, "*interfer[ing]* with the[ir] reserved water rights" in some way, *ante*, at 562, could the Tribe then ask the federal government to "devise a plan" for achieving compliance with its obligations, App. 86. And, for all anyone presently can tell, the United States may be interfering in just that way. Asking the federal government to assess what it holds in trust and to ensure that it is not misappropriating water that belongs to the Tribe has nothing to do with building pipelines or farming land.

B

Having mistaken the nature of the Navajo's complaint, the Court proceeds next to analyze it under the wrong legal framework. Citing cases like *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162 (2011); *United States* v. *Navajo Nation*, 537 U. S. 488 (2003) (*Navajo I*); and *United States* v. *Mitchell*, 445 U. S. 535 (1980) (*Mitchell I*), the Court tries to hammer a square peg (the Navajo's request) through a round hole (our Tucker Acts framework). See *ante*, at 563–564, and n. 1. To understand why those cases are inapposite, a little background is in order.

When an Indian Tribe seeks damages from the United States, it must usually proceed under the terms of the Tucker Act, 28 U. S. C. §1491, and the Indian Tucker Act, §1505. Together, those provisions facilitate suits for money damages in the Court of Federal Claims for claims "arising under the Constitution, laws or treaties of the United States, or Executive orders of the President." *Ibid.* Notably, however, the Tucker Acts provide only a selective waiver

of sovereign immunity, not a cause of action.   To determine whether a Tribe can seek money damages on any given claim, this Court has laid out a two-part test.   First, a court must ascertain whether there exists "specific rights-creating or duty-imposing statutory or regulatory prescriptions," *Navajo I*, 537 U. S., at 506, producing a scheme that bears the "hallmarks of a more conventional fiduciary relationship," *United States* v. *White Mountain Apache Tribe*, 537 U. S. 465, 473 (2003).   Second, once a Tribe has identified such a provision, the court must use "trust principles" to assess whether (and in what amount) the United States owes damages.   *United States* v. *Navajo Nation*, 556 U. S. 287, 301 (2009) (*Navajo II*).

To describe this regime is to explain why the Court errs in relying on it.   The Navajo do not bring a claim for money damages in the Court of Federal Claims under the Tucker Acts (thereby implicating those Acts' selective waiver of sovereign immunity).   Rather, the Navajo seek equitable relief in federal district court on a treaty claim governed by the familiar principles recounted above.   See *supra*, at 12–17. They do so with the help of 28 U. S. C. §1362, a provision enacted *after* the Tucker Acts that gives federal district courts "original jurisdiction" over "civil actions" brought by Tribes "under the Constitution, laws, or treaties of the United States."   *Ibid.*; see also Brief for Historians as *Amici Curiae* 31.   As this Court has noted, §1362 serves "to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought."   *Moe*, 425 U. S., at 472.   That perfectly summarizes the claim that the Navajo advance here—a treaty-based claim bottomed on *Winters* that all agree the United States could bring in its capacity as a trustee.   Nor does anyone question that the United States has waived sovereign immunity for claims "seeking relief other than money damages" based on an allegation that federal officials have "acted or failed to act" as the law requires.   5 U. S. C. §702.

This Court's decisions have long recognized that claims for equitable relief in federal district court operate under a distinct framework than claims for money damages brought in the Court of Federal Claims under the Tucker Acts. In *United States* v. *Mitchell*, 463 U. S. 206 (1983) (*Mitchell II*), for example, the United States argued that the Court should not allow an action for damages under the Tucker Acts to proceed because the plaintiffs could have brought a *separate* "actio[n] for declaratory, injunctive, or mandamus relief against the Secretary" in federal district court. *Id.*, at 227. This Court agreed with the government's assessment that the plaintiffs could have brought a claim like that—even as it went on to hold that they were free to bring a damages action under the Tucker Acts framework too. *Ibid.*

Lower courts have appreciated all this as well. As they have observed, nothing in the Tucker Acts or our decisions applying them "impl[ies] that [Tribes] are not [separately] entitled to declaratory or injunctive relief" under other laws or treaties and the traditional framework described above. *Cobell* v. *Norton*, 240 F. 3d 1081, 1101 (CADC 2001); see also *Loudner* v. *United States*, 108 F. 3d 896, 899 (CA8 1997). Consistent with this approach, they have frequently allowed Tribes to bring freestanding claims seeking to enforce treaty obligations—including water-related ones. See, *e. g., Pyramid Lake Paiute Tribe of Indians* v. *Morton*, 354 F. Supp. 252, 256 (DC 1973) (requiring the Secretary of the Interior to "justify any diversion of water from the Tribe with precision"); see also *Northwest Sea Farms, Inc.* v. *United States Army Corps of Engineers*, 931 F. Supp. 1515, 1520 (WD Wash. 1996) ("In carrying out its fiduciary duty, it is the government's . . . responsibility to ensure that Indian treaty rights are given full effect"). The cases the Court relies on simply do not enter the picture.

C

After misreading the Navajo's request and applying the wrong analytical framework, the Court errs in one last way.

It reaches the wrong result even under this Court's Tucker Acts framework. The second step of the analysis—using "trust principles" to sort out the damages the United States owes, *Navajo II*, 556 U. S., at 301—clearly has no purchase in this context. (Another tell that the Tucker Acts framework itself has no purchase.) But what about the first step? Historically, this Court's cases have distinguished between regulatory schemes that create "bare trusts" (that cannot sustain actions for damages) and a "conventional" trust (that can make the government "liable in damages for breach" under the Tucker Acts). *White Mountain Apache Tribe*, 537 U. S., at 473–474; see *ante*, at 565–566. A close look at those decisions suggests that, even under them, the Tribe's claim should be allowed to proceed.

Take *Mitchell II* as an example. There, this Court allowed a claim for money damages relating to the mismanagement of tribal forests. On what basis? A patchwork of statutes and regulations, along with some assorted representations by the Department of the Interior. 463 U. S., at 219–224. In holding this showing sufficient to support an action for money damages, this Court observed that, "where the Federal Government takes on or has control" of property belonging to a Tribe, the necessary "fiduciary relationship normally exists . . . even though nothing is said expressly" about "a trust or fiduciary connection." *Id.*, at 225 (internal quotation marks omitted). Further, where the federal government has "full responsibility" to manage a resource or "elaborate control" over that resource, the requisite "fiduciary relationship *necessarily* arises." *Id.*, at 224–225 (emphasis added). Statements by the United States "recogniz-[ing]" a fiduciary duty, the Court explained, can help confirm as much too. *Id.*, at 224.

Consider *White Mountain Apache Tribe* as well. There, this Court allowed a claim for money damages based on the United States' breach of its "fiduciary duty to manage land and improvements" on a reservation. 537 U. S., at 468. The Tribe defended the right to bring that claim by pointing

to a statute declaring certain lands would be " 'held by the United States in trust' " for the Tribe and allowing the Secretary of the Interior to use " 'any part' " of those lands " 'for administrative or school purposes.' " *Id.*, at 469. In holding that statute sufficient to support a claim for money damages, this Court emphasized the United States exercised authority over the assets at issue and had considerable "discretionary authority" over their use. *Id.*, at 475.

Held even to these yardsticks, the Navajo's complaint easily measures up. Our *Winters* decisions recognize that the United States holds reserved water rights "[a]s a *fiduciary*" for the Tribes. *Arizona II*, 460 U. S., at 627–628 (emphasis added). The United States' control over adjacent water sources—including the Colorado River—is "elaborate." *Mitchell II.* 463 U. S., at 225; see also *Arizona I*, 373 U. S., at 564–565; *White Mountain Apache Tribe*, 537 U. S., at 475. It can dole out water in parts of the Colorado by contract. 43 U. S. C. § 617d. And, of course, the United States has expressly acknowledged that it holds water rights "in trust" for the Navajo, see Brief for Federal Parties 37; Tr. of Oral Arg. 40, perhaps including rights in the Colorado River mainstream, *id.*, at 33. Given these features, the Navajo's complaint more than suffices to state a claim for relief.

## IV

Where do the Navajo go from here? To date, their efforts to find out what water rights the United States holds for them have produced an experience familiar to any American who has spent time at the Department of Motor Vehicles. The Navajo have waited patiently for someone, anyone, to help them, only to be told (repeatedly) that they have been standing in the wrong line and must try another. To this day, the United States has never denied that the Navajo may have water rights in the mainstream of the Colorado River (and perhaps elsewhere) that it holds in trust for the Tribe. Instead, the government's constant refrain is that the Navajo

can have all they ask for; they just need to go somewhere else and do something else first.

The Navajo have tried it all. They have written federal officials. They have moved this Court to clarify the United States' responsibilities when representing them. They have sought to intervene directly in water-related litigation. And when all of those efforts were rebuffed, they brought a claim seeking to compel the United States to make good on its treaty obligations by providing an accounting of what water rights it holds on their behalf. At each turn, they have received the same answer: "Try again." When this routine first began in earnest, Elvis was still making his rounds on The Ed Sullivan Show.

If there is any silver lining here it may be this. While the Court finds the present complaint lacking because it understands it as seeking "affirmative steps," the Court does not pass on other potential pleadings the Tribe might offer, such as those alleging direct interference with their water rights. Importantly, too, the Court recognizes that the Navajo "may be able to assert the interests they claim in water rights litigation, including by seeking to intervene in cases that affect their claimed interests." *Ante*, at 568–569. After today, it is hard to see how this Court (or any court) could ever again fairly deny a request from the Navajo to intervene in litigation over the Colorado River or other water sources to which they might have a claim. Principles of estoppel, if nothing else, may have something to say about the United States' ability to oppose requests like that moving forward. Cf. *United States* v. *Louisiana*, 394 U. S. 11, 73–74, n. 97 (1969). All of which leaves the Navajo in a familiar spot. As they did at Bosque Redondo, they must again fight for themselves to secure their homeland and all that must necessarily come with it. Perhaps here, as there, some measure of justice will prevail in the end.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

None